# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Hammer, U.S.M.J. |
| | : | |
| v. | : | Mag. No. 25-10123 |
| | : | |
| ROUZBEH "ROSS" HAGHIGHAT | : | **CRIMINAL COMPLAINT** |
| | : | |

I, Zachary M. Davies, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Postal Inspector of the United States Postal Inspection Service, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.


*s/ Zachary M. Davies*
Inspector Zachary M. Davies
U.S. Postal Inspection Service


Inspector Zachary M. Davies attested to this Complaint by telephone pursuant to F.R.C.P. 4. l(b)(2)(A) on this 28th day of April, 2025 at


*s/ Michael A. Hammer*
Honorable Michael A. Hammer
United States Magistrate Judge

## ATTACHMENT A

### COUNT ONE
**(Conspiracy to Commit Securities Fraud)**

From in or around May 2023 through in or around November 2023, in the District of New Jersey, and elsewhere, defendant

### ROUZBEH "ROSS" HAGHIGHAT

did knowingly and willfully combine, conspire, confederate and agree with others, including CC-1, to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

All in violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Zachary M. Davies, am a Postal Inspector with the U.S. Postal Inspection Service. I have participated in this investigation, discussed this matter with other law enforcement officers, and have reviewed documents and other materials. I have knowledge of the following facts. Because this Criminal Complaint is being submitted only for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part and all dates and figures are approximate.

## BACKGROUND

1.  At all times relevant to this Complaint, unless otherwise indicated:

### The Co-Conspirators

a.  Defendant ROUZBEH "ROSS" HAGHIGHAT ("HAGHIGHAT") resided in or around West Newbury, Massachusetts, was a Director on the Board of Directors ("Board") of Company-1 until at least June 9, 2023, when his term on the Board expired, after which HAGHIGHAT continued his relationship with Company-1 under a consulting agreement. HAGHIGHAT continued to attend Company-1 Board meetings as a consultant, including attending a Board meeting on or about June 11, 2023.

b.  CC-1, a co-conspirator not charged in this Complaint, resided in or around New York and Massachusetts. CC-1 is HAGHIGHAT's close relative.

### Relevant Entities

c.  Company-1 was a clinical-stage biopharmaceutical company focused on discovering, developing, and commercializing precision medicines for kidney diseases. Company-1 was incorporated in Delaware with principal offices in or around Seattle, Washington. Company-1 securities traded on the NASDAQ national securities exchange.

d.  Company-2 was a Swiss multinational pharmaceutical corporation based in or around Basel, Switzerland, with United States operations in or around East Hannover, New Jersey. Company-2 shares were listed on the New York Stock Exchange.

e.  The NASDAQ was a United States stock exchange with servers in or around Carteret, New Jersey, and elsewhere, in the District of New Jersey, that were used for the execution of trades in NASDAQ-listed companies, including Company-1.

2

## Acquisition Timeline

f.  On or about May 4, 2023, Company-2 first contacted Company-1 orally to propose an acquisition of Company-1. Later that day, Company-2 sent Company-1 a written non-binding preliminary proposal to acquire Company-1 for $32 per share in cash. On or about May 3, 2023, the closing price of Company-1 shares was approximately $19.13.

g.  Throughout May and early June 2023, Company-1's Board and senior management negotiated the terms of a merger agreement with Company-2. For example, on or about May 5, 2023, and May 6, 2023, Company-1's Board, including HAGHIGHAT, and senior management met to discuss Company-2's proposal and met with financial advisors to evaluate that proposal. Company-1's Board also authorized Company-1 senior management to retain financial advisors.

h.  On or about May 9, 2023, and May 10, 2023, certain Company-1 employees executed a "Confidentiality Acknowledgment," which indicated, among other things, the sensitivity of the acquisition information to Company-1:

- the signer was "aware of discussions that may lead to a potential strategic transaction involving Company-1 Therapeutics, Inc. (a 'Transaction')."

- the signer "understand[s] that this information is highly sensitive and requires the utmost confidentiality even, within Company-1, and that this is material information that has not been publicly disclosed."

- "Unless and until Company-1 publicly announces such a Transaction, [the signer] will not disclose or discuss this information with anyone including [the signer's] family members . . . ."

- the signer "understand[s] that the civil and criminal consequences of trading in Company-1's securities while in possession of material, non-public information, or 'tipping' others to trade in such securities, can be severe including substantial finds and prison sentences."

i.  On or about May 12, 2023, Company-1 and Company-2 entered into a confidentiality agreement. Company-1 provided Company-2 with online access to preliminary due diligence information.

j.  On or about May 15, 2023, Company-1's senior management and a financial advising firm presented information on Company-1's clinical and

preclinical programs to Company-2. On or about May 16, 2023, Company-1's Board, including HAGHIGHAT, and senior management met with advisors to discuss the Company-2 meeting.

k.   On or about May 22, 2023, Company-2 indicated it would increase its proposed all-cash purchase price to $36.00 per share. Company-1 senior management discussed the revised proposal with the Board, including HAGHIGHAT. Later, on or about May 22, 2023, Company-1's Board, including HAGHIGHAT, directed its financial advisor to respond to Company-2 that Company-1 would be willing to proceed at a price of $40.00 per share and a contingent value right that would pay $4.00 per share on certain conditions.[1]

l.   On or about May 26, 2023, Company-2 informed Company-1 that Company-2 would be willing to increase the proposed purchase price to $40.00 per share with a contingent value right of $4.00 per share with certain conditions. Company-1's Board, including HAGHIGHAT, and senior management met with advisors to discuss Company-2's May 26 proposal, and submitted a counterproposal to Company-2. The Board, including HAGHIGHAT, determined that Company-1 would be willing to proceed on an exclusive negotiating basis until June 12, 2023, at a price of $40.00 per share with two contingent value rights paying up to $4.00 per share on certain conditions. Company-1 entered into an engagement letter with a financial advisor in connection with the transaction.

m.   On or about May 27, 2023, Company-2 contacted Company-1 and indicated Company-2 would proceed with the acquisition under Company-1's proposal. Company-1's Board, including HAGHIGHAT, approved moving forward with the proposed transaction. Company-1's Board, including HAGHIGHAT, discussed the proposal by email. In response to an email describing the terms discussed with Company-2, HAGHIGHAT wrote: "Well done and very much consistent with the guardrails we talked about. I am supportive and believe launching DD ASAP is very important to keeping the deadline we seek. Ross[.]"

n.   From approximately May 30, 2023, through approximately June 10, 2023, Company-1 and Company-2 negotiated the specific terms of the agreements. On or about June 9, 2023, the last trading day before the acquisition announcement, the closing price for Company-1 stock was approximately $23.99 per share.

o.   On or about June 11, 2023, Company-1's Board approved final drafts of the agreement. HAGHIGHAT was present at the June 11, 2023 Company-1 Board meeting.

---

[1] Contingent value rights may be used in merger transactions to offer additional consideration to a target company's shareholders if specific future events or milestones are achieved.

p.     On or about June 12, 2023, at approximately 1:00 a.m.,[2] Company-1 publicly announced that it had entered into an agreement and plan of merger with Company-2 under which Company-2 would acquire Company-1 for $40 per share in cash, or a total of approximately $3.2 billion (the "Merger Announcement"). On or about June 12, 2023, the closing price for Company-1 stock was $37.98 per share following the Merger Announcement.

## OVERVIEW OF THE INSIDER TRADING CONSPIRACY

2.     From in or around May 2023 through in or around November 2023, HAGHIGHAT and CC-1 orchestrated a scheme to engage in and profit from insider trading in Company-1's securities based on material, nonpublic information ("MNPI") about Company-1's merger with Company-2 that HAGHIGHAT received in his capacity as a Director on Company-1's Board. In violation of his duties, HAGHIGHAT tipped CC-1 and others, known and unknown, to trade in Company-1 securities on the basis of that MNPI.

3.     HAGHIGHAT knew that he was prohibited from trading, and tipping others to trade, on the basis of MNPI. For example, Company-1 had an Insider Trading Policy approved by Company-1's Board during HAGHIGHAT's tenure on the Board. The Policy applied "to our employees and directors, as well as to their immediate family members," whom the policy defined as "Insiders." The Policy stated, among other things, that "Insider trading happens when someone with knowledge of material nonpublic information ('MNPI') about Company-1 uses that MNPI, or tips off someone else to use the MNPI, to gain profits or avoid losses in the stock market." The Policy stated: "Never buy or sell our stock when in possession of MNPI; . . . Keep all MNPI confidential, including from your family and friends . . . ."

4.     Despite knowing about the trading restrictions, HAGHIGHAT shared the MNPI with CC-1 and others, known and unknown, with the expectation that CC-1 and others would trade in Company-1 securities based on that MNPI. After receiving the MNPI, CC-1 purchased Company-1 call options using CC-1's personal brokerage accounts, and profited from those trades after the options increased in price following the Merger Announcement. CC-1 and HAGHIGHAT then shared in the proceeds of CC-1's sale of Company-1 options.[3]

5.     In total, this insider trading scheme resulted in HAGHIGHAT and CC-1 making at least $114,081 in illegal trading profits.

---

[2] All times are approximate and represented in Eastern Time (ET) and all dates, times, numbers, and figures referenced herein are approximate.

[3] A call option provides the buyer with the right, but not the obligation, to purchase 100 shares of the underlying security at a specified price (the "strike price") on or before the option's expiration date. The purchase of a call option is considered a "bullish" trade because the purchaser stands to benefit from an increase in the price of the underlying security.

## THE CONSPIRACY

6. HAGHIGHAT, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to CC-1 who traded Company-1 securities on the basis of that MNPI. CC-1 purchased approximately 153 "out of the money" Company-1 call options prior to the announcement of the Company-2 acquisition, which CC-1 later sold for a profit of approximately $114,081. CC-1 then shared the profits with HAGHIGHAT.

7. On or about May 22, 2023, HAGHIGHAT attended a Company-1 Board meeting at which the proposed acquisition was discussed. That same day, HAGHIGHAT messaged CC-1, writing, "I just finished Board call," and "Looking forward to our drive back on Wednesday[.]"

8. On or about Wednesday, May 24, 2023, HAGHIGHAT picked up CC-1 from in or around Brooklyn, New York, and they drove back to HAGHIGHAT's home in or around West Newbury, Massachusetts.

9. On or about May 25, 2023, CC-1 visited a webpage displaying options prices for Company-1. On or about May 26, 2023, CC-1 visited a website with an "Options Profit Calculator."

10. On or about June 5, 2023, CC-1 purchased approximately 153 Company-1 call options expiring June 16, 2023, for approximately $0.37 per contract, for a total of approximately $5,505. CC-1 conducted CC-1's trading in Company-1 in CC-1's brokerage account at Broker-1. CC-1 purchased the options on an exchange with servers in or around New Jersey.

11. On or about June 12, 2023, the Acquisition Announcement occurred at approximately 1:00 a.m. Shortly thereafter, CC-1 viewed several "X"[4] posts about the Company-1 merger proposal. At approximately 4:02 a.m., CC-1 texted HAGHIGHAT: "4 am on the dot $35k order in from someone at $39/share. . . . Passing out – night!"

12. Later on or about June 12, 2023, HAGHIGHAT and CC-1 had the following text exchange:

> HAGHIGHAT:   Did you get it done?
>
> CC-1:   Chunks/game plan finalized – excited to show you when you get home. Going to The Quin Club in Boston with a friend later, helping mom now with the yard

---

[4] At the time of this activity, Twitter, Inc., changed its name to "X." All reference to "X" refer to the social media platform formerly known as Twitter.

6

|              |                                                                                                                                                                                     |
|--------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | work                                                                                                                                                                                |
| CC-1:        | Muddy water's response: https://seekingalpha.com/news/3979313-short-seller-still-believes-Company-1s-lead-drug-wont-be-approved-amid-Company-2-deal<br><br>doubled down            |
| HAGHIGHAT:   | Thnx. Desperate move to protect their short position. Ignore.                                                                                                                       |
| CC-1:        | Couldn't be more obvious – was laughing about it                                                                                                                                    |
| CC-1:        | Bloomberg baby https://www.bloomberg.com/news/articles/2023-06-12/carson-block-s-latest-short-bet-is-burned-by-Company-2-m-a-deal<br><br>$58 mil loss                              |
| HAGHIGHAT:   | Old Bull versus Young Bull<br>Kids playing the adult game                                                                                                                           |

13. From on or about June 12, 2023, after the Acquisition Announcement, through on or about June 14, 2023, CC-1 sold approximately 153 Company-1 call options expiring June 16, 2023, for a total profit of approximately $114,081.

14. CC-1 and HAGHIGHAT then discussed the proceeds of CC-1's profits from trading Company-1 options. For example, on or about Thursday, July 6, 2023, CC-1 and HAGHIGHAT had the following message exchange:

|              |                                                                                                                                                                                                      |
|--------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| CC-1:        | Tuesday for $ in my bank, scheduled to clear monday (just called)                                                                                                                                     |
| HAGHIGHAT:   | Oh nice. Life is good. Decide how much of it you plan to save. Move it and forget it. Saving is done at the beginning, never at the end. **I'm glad this worked out honey.**                          |

7

| | |
|---|---|
| CC-1: | Unfortunately not much to save after I pay off all school loans/debt - $58k total for every last penny I owe. BUT what a friggen blessing to be debt free at this stage of my life. **So glad it worked out as well – very very very grateful** |

(emphasis added)

15. On or about July 11, 2023, approximately $110,000 transferred from CC-1's account at Broker-1 to CC-1's bank account at Bank-1. That same day, CC-1 messaged HAGHIGHAT writing: "$ - let me know good place to wire (can get a check etc too, whatever is best for you), will do this morning[.]" HAGHIGHAT did not appear to respond directly by message.

16. Beginning on or about July 11, 2023, and continuing through approximately July 21, 2023, CC-1 transferred more than approximately $55,000 from CC-1's account at Bank-1 back into CC-1's brokerage account at Broker-1.

17. From approximately August 2023 to November 2023, HAGHIGHAT and CC-1 corresponded about how to CC-1 could send HAGHIGHAT his share of CC-1's profits from trading Company-1 options.

18. For example, on or about August 2, 2023, HAGHIGHAT and CC-1 had the following message exchange:

| | |
|---|---|
| HAGHIGHAT: | [CC-1], I'd like to close the loop on fund transfer this week. Easiest is to write out a check or transfer to me and I'll redirect into individual accounts. Let's discuss logistics tonight. Thnx |
| CC-1: | No prob – it's sitting in my [Broker-1] account as cash, I'll transfer it to my bank now so it goes in in next 48 hrs |
| CC-1: | Was gonna do it last week but got sidetracked with the nyc stuff, everything here, sorry |
| CC-1: | But yes no prob to get a cashiers check over to you when ready |

8

19.     On or about August 4, 2023, CC-1 caused the transfer of approximately $62,757.84 from CC-1's Broker-1 account to CC-1's Bank-1 account.

20.     On or about August 5, 2023, CC-1 messaged HAGHIGHAT, writing: "Also cash is now in bank account can get you a check who should it be made out to . . . Was going to write check for $57,500 – total of $62,500 less $5k for the investment vehicle on my end that we talked about."

21.     On or about August 7, 2023, CC-1 caused a cashier's check in the amount of $55,015 to be drawn from CC-1's Bank-1 account for the benefit of HAGHIGHAT, which HAGHIGHAT later claimed in messages to CC-1 that he lost. From approximately August 2023 to October 2023, CC-1 and HAGHIGHAT then discussed how long it would take CC-1 to replace the lost check. .

22.     For example, on or about August 9, 2023, CC-1 and HAGHIGHAT had the following message exchange:

| | | |
|---|---|---|
| CC-1: | | Let's have mom look – I'd have to get an indemnity bond (insurance) for the amount of the check and that could take up to 90 days to replace, and I get a cancellation fee |
| | | It HAS to be in there somewhere – did you take it with you to work on Monday or anything |
| HAGHIGHAT: | | I have not seen it |
| | | . . . |
| CC-1: | | . . . Manager at nbpt [Bank-1] calling me back soon **I lied and said it was for a wedding this weekend and urgent**, if they can even just cancel it so the money goes back and I can write a standard $55k check etc, she's looking into what she can |
| | | (emphasis added) |

23.     On or about August 24, 2023, CC-1 informed HAGHIGHAT that it would take at least 91 days to replace the lost check in the following message exchange:

9

|   |   |
|---|---|
| HAGHIGHAT: | The $55k can be claimed 91 days after issue. It was issued on Aug 5 so earliest will be Oct 6th which it socks (sic) |
| CC-1: | Ugh. That just makes no sense to me, it's a check, they have all the info, we know nobody else has it, should be as easy as just cancelling a check. Really dumb. I'm so sorry |

24. On or about October 9, 2023, CC-1 and HAGHIGHAT again discussed over text messages the timing of when CC-1 could replace the funds from the check that HAGHIGHAT had misplaced:

|   |   |
|---|---|
| HAGHIGHAT: | [CC-1], tomorrow is Oct 10 and the wait period to claim the [Bank-1] bank check is over. Meaning you can claim the sum to be placed back in your account. Can u look into that |
| CC-1: | Figured my mom updated you, she was already on me about it – I called on October 8 (the check was written August 7), they said they can't cancel/do anything for 90 +1 days |
| CC-1: | Happy to go through that high net worth women if you think? I called the general [Bank-1] number who said it had to be done through the place I got the check, so talked to the manager at the haverhill [Bank-1]<br><br>Sorry not October 8, Friday October 6 |
| HAGHIGHAT: | OK 90 days is Nov 7 not Oct. Let's pick this up next month. Yes we can go thru [Bank-1] contacts |

10

25. Similarly, on or about November 6, 2023, CC-1 and HAGHIAGHAT had the following message exchange:

| | |
|---|---|
| CC-1: | Heading to [Bank-1] – do u have wiring instructions? I can also just have it canceled for now and deal with it when you're back |
| HAGHIGHAT: | Plse ask [Individual-1]. I'm on conf call. Thnx honey |
| CC-1: | I did – all good – we'll take care of it. Talk soon |
| HAGHIGHAT: | Thanks honey |

26. On or about November 6, 2023, a $55,000 cashier's check purchased by CC-1 and made out to HAGHIGHAT was deposited into HAGHIGHAT's account at Broker-2. When investigating agents later asked HAGHIGHAT the purpose of this check, HAGHIGHAT stated that it was repayment for HAGHIHGAT having paid CC-1's student debt.On or about March 4, 2025, when speaking with investigating federal agents, HAGHIGHAT made numerous statements, including falsely stating that he was not aware of "the details" of the negotiations regarding the Company-2 acquisition.