FILED

MAY 2 2 2025

2:26 PM.

AT 8:30   M
CLERK, U.S. DISTRICT COURT - DNJ

2026R00076/JPM

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael E. Farbiarz |
| | : | |
| v. | : | Crim. No. 25-339 |
| | : | |
| ROUZBEH "ROSS" HAGHIGHAT, | : | <u>Count 1</u> |
| BEHROUZ "BRUCE" HAGHIGHAT, | : | 18 U.S.C. § 1348 |
| KIRSTYN M. PEARL, | : | 18 U.S.C. § 2 |
| SEYEDFARBOD "FABIO" SABZEVARI, | : | (Securities Fraud) |
| and | : | |
| JAMES D. ROBERGE | : | |
| | : | <u>Counts 2–17</u> |
| | : | 15 U.S.C. §§ 78j(b) & 78ff |
| | : | 17 C.F.R. § 240.10b-5 |
| | : | 18 U.S.C. § 2 |
| | : | (Securities Fraud) |
| | : | |
| | : | <u>Counts 18–19</u> |
| | : | 18 U.S.C. § 1349 |
| | : | (Conspiracy to Commit Securities Fraud) |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, New Jersey charges:

### Overview of the Scheme

1.      Defendants ROUZBEH "ROSS" HAGHIGHAT, BEHROUZ "BRUCE" HAGHIGHAT, KIRSTYN M. PEARL, SEYEDFARBOD "FABIO" SABZEVARI, and JAMES D. ROBERGE made illegal profits by trading in securities of Company-1, based on material nonpublic information ("MNPI") regarding Company-2's acquisition of Company-1 (the "Acquisition"). The defendants exploited MNPI they

possessed in violation of duties owed in order to execute profitable and timely trades in Company-1 securities. Together, the defendants profited more than approximately $600,000 from the scheme.

### Relevant Background—Defendants, Entities, & Terms

2.    At certain times relevant to this Indictment:

a.    From in or around January 2009 through on or about June 9, 2023, ROUZBEH "ROSS" HAGHIGHAT ("ROSS HAGHIGHAT"), a resident of Massachusetts, was a Director on the Board of Directors of Company-1, after which he continued his relationship with Company-1 under a consulting agreement. In his position as a Director, ROSS HAGHIGHAT obtained MNPI about Company-1's merger with Company-2. ROSS HAGHIGHAT was also Chief Executive Officer ("CEO") and Chairman of Company-3, a Massachusetts-based defense contracting firm.

b.    BEHROUZ "BRUCE" HAGHIGHAT ("BRUCE HAGHIGHAT"), a resident of California, was ROSS HAGHIGHAT's brother. BRUCE HAGHIGHAT held a Master of Business Administration and was the CEO of a company headquartered in or around Princeton, New Jersey.

c.    KIRSTYN M. PEARL ("PEARL"), a resident of New York and Massachusetts, was ROSS HAGHIGHAT's step-daughter. PEARL also worked for ROSS HAGHIGHAT and Company-3.

2

d.    SEYEDFARBOD "FABIO" SABZEVARI ("SABZEVARI"), a resident of California, was an employee of Company-3, where he worked with ROSS HAGHIGHAT. SABZEVARI described ROSS HAGHIGHAT as his "mentor."

e.    JAMES D. ROBERGE ("ROBERGE"), a resident of Massachusetts, was friends with ROSS HAGHIGHAT. ROBERGE was an engineer for Company-4, an American multinational aerospace and defense firm headquartered in Arlington, Virginia.

f.    Company-1, which was incorporated in Delaware with principal offices in or around Seattle, Washington, was a clinical-stage biopharmaceutical company focused on discovering, developing, and commercializing precision medicines for kidney diseases. Company-1 was an issuer with securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 15 of the Exchange Act.

g.    Company-1 securities traded on the Nasdaq Stock Market ("Nasdaq"), an American stock exchange with servers in or around Carteret, New Jersey, in the District of New Jersey, and elsewhere, which were used for the execution of trades in Nasdaq-listed companies, including Company-1.

h.    Company-2 was a multinational pharmaceutical corporation based in or around Basel, Switzerland, with United States operations in or around East Hannover, New Jersey. Company-2 securities traded on the New York Stock Exchange.

3

      i.     Broker-1, Broker-2, Broker-3, Broker-4, and Broker-5 were all licensed broker-dealers who facilitated the buying and selling of securities, including Company-1 stock and options.

      j.     A call option provided the buyer with the right, but not the obligation, to purchase shares of the underlying security at a specified price (the "strike price") on or before the option's expiration date. The purchase of a call option was considered a "bullish" trade because the purchaser stands to benefit from an increase in the price of the underlying security.

      k.     An "out-of-the-money" call option was one in which the then-current market price of the underlying asset (stock) was below the strike price of the option, i.e., the current stock price was lower than the price at which a trader would be able to buy the stock if the trader exercised the option. Out-of-the-money options were generally less expensive than "in the money" options and were typically used when a trader expects a big move in the stock price because if a call option was "out of the money" at the time of expiration, the option becomes worthless and the holder of the option at that time loses the entire amount invested in the option.

      l.     WhatsApp was a messaging service that enabled users to communicate with greater privacy than SMS text messages due to encryption features.

### Acquisition Timeline

      3.     On or about May 3, 2023, the closing price of Company-1 shares was approximately $19.13. On or about May 4, 2023, Company-2 first contacted Company-

1 orally to propose a Company-2 acquisition of Company-1. Later that day, Company-2 sent Company-1 a non-binding preliminary proposal to acquire Company-1 for $32 per share in cash.

4.     Throughout in or around May and early June 2023, Company-1's Board and senior management negotiated the terms of a merger agreement with Company-2. For example, on or about May 5, 2023, and May 6, 2023, Company-1's Board, including ROSS HAGHIGHAT, and senior management met to discuss Company-2's proposal and met with financial advisors to evaluate that proposal.

5.     On or about May 9, 2023, and May 10, 2023, certain Company-1 employees executed a "Confidentiality Acknowledgment," which indicated, among other things, the sensitivity of the information to Company-1, including that:

- the signer was "aware of discussions that may lead to a potential strategic transaction involving [Company-1] (a 'Transaction')."

- the signer "understand[s] that this information is highly sensitive and requires the utmost confidentiality even, within [Company-1], and that this is material information that has not been publicly disclosed."

- "Unless and until [Company-1] publicly announces such a Transaction, [the signer] will not disclose or discuss this information with anyone including [the signer's] family members . . . ."

- the signer "understand[s] that the civil and criminal consequences of trading in [Company-1]'s securities while in possession of material, non-public information, or 'tipping' others to trade in such securities, can be severe including substantial finds and prison sentences."

6.     On or about May 12, 2023, Company-1 and Company-2 entered into a confidentiality agreement. Company-1 then provided Company-2 with online access to due diligence materials.

7.     On or about May 15, 2023, Company-1's senior management and a financial advising firm presented information on Company-1's clinical and preclinical programs to Company-2. On or about May 16, 2023, Company-1's Board, including ROSS HAGHIGHAT, and senior management met with advisors to discuss the Company-2 meeting.

8.     On or about May 22, 2023, Company-2 indicated it would increase its proposed all-cash purchase price to $36.00 per share. Company-1 senior management discussed the revised proposal with the Board, including ROSS HAGHIGHAT. Later on or about May 22, 2023, Company-1's Board, including ROSS HAGHIGHAT, directed its financial advisor to respond to Company-2 that Company-1 would be willing to proceed at a price of $40.00 per share and a contingent value right that would pay $4.00 per share with certain conditions. Typically, contingent value rights were used in merger transactions to offer additional benefits to a target company's shareholders if specific future events or milestones were achieved.

9.     On or about May 26, 2023, Company-2 informed Company-1 that Company-2 would be willing to increase the proposed purchase price to $40.00 per share with a contingent value right of $4.00 per share with certain conditions. Company-1's Board, including ROSS HAGHIGHAT, and senior management met with advisors to discuss Company-2's May 26 proposal, and submitted a

6

counterproposal to Company-2. The Board, including ROSS HAGHIGHAT, determined that Company-1 would be willing to proceed on an exclusive negotiating basis until on or about June 12, 2023, at a price of $40.00 per share with contingent value rights paying up to $4.00 per share with certain conditions. On or about the same day, Company-1 entered into an engagement letter with a financial advisor in connection with the transaction.

10.    On or about May 27, 2023, Company-2 contacted Company-1 and indicated Company-2 would proceed with the acquisition under Company-1's proposal. Company-1's Board, including ROSS HAGHIGHAT, approved moving forward with the proposed transaction. Company-1's Board, including ROSS HAGHIGHAT, discussed the proposal by email the same day. In response to an email describing the terms discussed with Company-2, ROSS HAGHIGHAT wrote: "Well done and very much consistent with the guardrails we talked about. I am supportive and believe launching DD ASAP is very important to keeping the deadline we seek. Ross[.]" In finance, "DD" typically stood for due diligence, the process of reviewing and evaluating a deal before finalizing an investment or transaction.

11.    From on or about May 30, 2023, through on or about June 10, 2023, Company-1 and Company-2 negotiated the specific terms of the transaction. On or about June 9, 2023, the last trading day before the acquisition announcement, the closing price for Company-1 stock was approximately $23.99 per share.

12.    On or about June 11, 2023, Company-1's Board met and approved final drafts of the agreement. Although no longer a member of Company-1's Board, ROSS

HAGHIGHAT attended the meeting. Company-2's board of directors also approved the transaction the same day.

13.    On or about June 12, 2023, at approximately 1:00 a.m. (all times referenced in this Indictment are approximate and represented in Eastern Time), Company-1 publicly announced that it had entered into an agreement and plan of merger with Company-2 under which Company-2 would acquire Company-1 for $40 per share in cash, or a total of approximately $3.2 billion (the "Acquisition Announcement"). The same day, Company-1's closing stock price was approximately $37.98 per share.

### The Insider Trading Scheme

14.    In his position as Director on Company-1's Board, ROSS HAGHIGHAT received MNPI about the Acquisition. In violation of his duties, ROSS HAGHIGHAT traded Company-1 securities on the basis of that MNPI and tipped others to trade in Company-1 securities on the basis of that MNPI.

15.    ROSS HAGHIGHAT knew that he was prohibited from trading on the basis of MNPI. For example, on or about February 27, 2023, Company-1 adopted an updated insider trading policy approved by Company-1's Board, including ROSS HAGHIGHAT (the "Policy"). The Policy applied "to our employees and directors, as well as to their immediate family members," whom the policy defined as "Insiders." The Policy stated, among other things, that "Insider trading happens when someone with knowledge of material nonpublic information ('MNPI') about Company-1 uses that MNPI, or tips off someone else to use the MNPI, to gain profits or avoid losses

in the stock market." The Policy further stated: "Never buy or sell our stock when in possession of MNPI; . . . Keep all MNPI confidential, including from your family and friends . . . ."

16.     ROSS HAGHIGHAT breached his duties as a Company-1 Director by trading Company-1 stock on the basis of MNPI regarding the acquisition by Company-2.

17.     For example, ROSS HAGHIGHAT was custodian of a brokerage account on behalf of his minor daughter at Broker-1 (the "Broker-1 Account"). On or about June 8, 2023, ROSS HAGHIGHAT purchased in the Broker-1 Account approximately 40 Company-1 shares at an approximate price of $23.69 per share. On or about June 12, 2023, the day of the Acquisition Announcement, ROSS HAGHIGHAT sold in the Broker-1 Account approximately 50 Company-1 shares at an approximate price of $37.61 per share, some of which had been purchased prior to in or around June 2023.

18.     ROSS HAGHIGHAT also breached his duties for personal and financial benefit by providing, for personal benefit, Company-1 MNPI regarding the Acquisition to others—with the expectation they would trade in Company-1 securities on the basis of that MNPI—including friends, family, and associates, who traded Company-1 securities upon receipt of and on the basis of that MNPI.

BEHROUZ "BRUCE" HAGHIGHAT

19.     ROSS HAGHIGHAT, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to BRUCE HAGHIGHAT, who then traded Company-1 securities on the basis of that MNPI. BRUCE HAGHIGHAT

purchased approximately 2,000 Company-1 shares prior to the Acquisition Announcement, which BRUCE HAGHIGHAT later sold for a profit of approximately $32,680.

20.     BRUCE HAGHIGHAT traded those shares in a brokerage account at Broker-2 in the name of the "Akma Irrevocable Trust," a trust for which BRUCE HAGHIGHAT was trustee and ROSS HAGHIGHAT was the grantor (the "Akma Account"). The Akma Account was managed by Financial Advisor-1, a wealth advisory firm at which both ROSS HAGHIGHAT and BRUCE HAGHIGHAT maintained accounts, including the Akma Account. Broker-2 was the broker for trading in the Akma Account.

21.     Specifically, on or about May 25, 2023, approximately three days after Company-2 indicated it would increase its proposed all-cash purchase price to $36.00 per share—which was MNPI known to ROSS HAGHIGHAT—BRUCE HAGHIGHAT emailed a wealth advisor, Advisor-1, at Financial Advisor-1, writing, "I have a short window of opportunity for a transaction. Is the AKMA account set up in a way that I can trade options?"

22.     Advisor-1 responded, "Unfortunately, that account is not set up for options trading. Would you like to add that capability to the account?" BRUCE HAGHIGHAT responded, "Yes, Pls add this option to this account ASAP. I will have a transaction for you as early as Friday, or next Tuesday. Pls let me know when this feature has been added."

23.    The following day, on or about May 26, 2023, Advisor-1 responded, "Because of the complexity of options trading and our compliance process, I think it would be in your best interest to place any options trading directly with [Broker-2] . . . on the retail side." BRUCE HAGHIGHAT responded, "Well time is of the essence."

24.    Also on or about May 26, 2023, BRUCE HAGHIGHAT and ROSS HAGHIGHAT exchanged several calls and texts throughout the day. At approximately 12:14 p.m., BRUCE HAGHIGHAT texted ROSS HAGHIGHAT, "What is the stick [sic] symbol." ROSS HAGHIGHAT then sent BRUCE HAGHIGHAT a WhatsApp message at approximately 12:14 p.m. with the Company-1 ticker symbol. At approximately 12:15 p.m., BRUCE HAGHIGHAT sent a text to ROSS HAGHIGHAT that read: "[Advisor-1] called me and he needs 3 days to set up for options. I am just going to buy it direct. If you changed your mind, let me know in the next hour." At approximately 12:15 p.m., ROSS HAGHIGHAT and BRUCE HAGHIGHAT spoke on the phone for approximately one minute and eighteen seconds. At approximately 12:20 p.m., BRUCE HAGHIGHAT sent a WhatsApp message to ROSS HAGHIGHAT that read: "Done. Let me know the exit." At approximately 12:25 p.m., ROSS HAGHIGHAT responded by WhatsApp: "OK we can talk[.]"

25.    At approximately 1:02 p.m. the same day, BRUCE HAGHIGHAT emailed Financial Advisor-1 writing, "did you put the trade in . . . don't see it on the account. I am trying to buy it today." The same day, approximately 2,000 Company-1

shares were purchased in the Akma Account at an approximate price of $22.66 per share.

26.    On or about June 12, 2023, at approximately 2:49 a.m., ROSS HAGHIGHAT sent an email to certain recipients, including another employee of Financial Advisor-1. The email attached Company-1's press release announcing the Acquisition. In the email, ROSS HAGHIGHAT wrote: "I am excited to share the news that earlier today, [Company-1] . . . , a company I've had the pleasure of being a co-founder and a member of the Board of Directors of, entered a binding agreement to be acquired by Company-2 in a $3.5 billion transaction."

27.    Also on or about June 12, 2023, the day of the Acquisition Announcement, BRUCE HAGHIGHAT texted ROSS HAGHIGHAT, "Let me know when u want to sell the stock." ROSS HAGHIGHAT responded, "Oh right. Let's all it [sic] for $39 anytime[.]" Shortly thereafter, ROSS HAGHIGHAT again texted BRUCE HAGHIGHAT, "Bruce Ali, on second thought, hold onto it. The deal is $40+2+2 or $42/sh. The deal should close in August. Stock is at $38. Seems it has another 5-8% gain to go. So let's leave it alone. Thnx[.]"

28.    The same day, on or about June 12, 2023, BRUCE HAGHIGHAT emailed Advisor-1 writing:

> I would like to place the following order. . . .
>
> **Stick [sic]: [Company-1 ticker symbol]**
> **Price per share: $39**
> **Sell all.**
>
> So, when it hits price of $39 per share, I like to sell all of them Else, [sic] sell none of it.

12

Good until cancelled.

Thanks,

Bruce

29.    On or about June 13, 2023, BRUCE HAGHIGHAT wrote in another email to Advisor-1, "let's hold off on this request below. I will contact you in 2 weeks time. I rather wait a little longer."

30.    On or about July 7, 2023, BRUCE HAGHIGHAT wrote an email instructing Advisor-1 to sell all Company-1 shares for $39.00 per share. Through the Akma Account, Advisor-1 sold approximately 2,000 Company-1 shares at approximately $39.00 per share that day, for an approximate profit of $32,680.

31.    On or about July 10, 2023, Advisor-1 wrote to BRUCE HAGHIGAHT: "Just a quick note—your trade has been completed, all shares liquidated. The account is now in cash pending further instruction." On or about that same day, BRUCE HAGHIGHAT texted ROSS HAGHIGHAT, "The stuff sold. All in cash now. If u r not moving it, we should put it into a MM fund. Will pay about 4-5%. Balance is now 122k."

32.    On or about July 24, 2023, the approximately $122,254 in the Broker-2 Akma Account was wired to an account at Broker-3 in the name of the "R. Ross Haghighat Irrev. Trust," for which BRUCE HAGHIGHAT was the trustee (the "Broker-3 Account").

## PEARL

33.    ROSS HAGHIGHAT, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to PEARL, who traded

13

Company-1 securities on the basis of that MNPI. PEARL purchased approximately 153 out-of-the-money Company-1 call options prior to the Acquisition Announcement, which PEARL later sold for a profit of approximately $114,081. PEARL then shared the illicit profits with ROSS HAGHIGHAT.

34.    On or about May 22, 2023, after ROSS HAGHIGHAT attended a Company-1 Board meeting at which the proposed acquisition was discussed, he messaged PEARL, "I just finished Board call," and "Looking forward to our drive back on Wednesday[.]"

35.    On or about Wednesday, May 24, 2023, ROSS HAGHIGHAT picked up PEARL from in or around Brooklyn, New York, and they drove back to ROSS HAGHIGHAT's home in or around West Newbury, Massachusetts.

36.    The next day, on or about May 25, 2023, PEARL visited a webpage displaying options prices for Company-1. On or about May 26, 2023, PEARL visited a website with an "Options Profit Calculator."

37.    The following day, on or about May 26, 2023, PEARL attempted to buy Company-1 call options in her brokerage account at Broker-4 (the "Broker-4 Account"), but the orders were rejected for insufficient funds. That same day, PEARL deposited approximately $5,000 via an automated teller machine (ATM) in or around Newburyport, Massachusetts, into her bank account at Bank-1. Later that same day, PEARL deposited approximately $5,000 from her Bank-1 account into her Broker-4 Account.

38.    On or about June 5, 2023, PEARL purchased in her Broker-4 Account approximately 153 Company-1 call options expiring on or about June 16, 2023, for approximately $0.37 per contract, for a total of approximately $5,505.

39.    On or about June 12, 2023, the Acquisition Announcement occurred at approximately 1:00 a.m.

40.    Later on or about June 12, 2023, ROSS HAGHIGHAT and PEARL had the following text exchange, in relevant part:

| | |
|---|---|
| ROSS HAGHIGHAT: | Did you get it done? |
| PEARL: | Chunks/game plan finalized — excited to show you when you get home[.] |

41.    From on or about June 12, 2023, after the Acquisition Announcement, through on or about June 14, 2023, PEARL sold approximately all of the 153 Company-1 call options, for a total profit of approximately $114,081.

42.    PEARL and ROSS HAGHIGHAT then discussed splitting the proceeds of PEARL's illicit profits. For example, on or about July 6, 2023, PEARL and ROSS HAGHIGHAT had the following message exchange:

| | |
|---|---|
| PEARL: | Tuesday for $ in my bank, scheduled to clear monday (just called) |
| ROSS HAGHIGHAT: | Oh nice. Life is good. Decide how much of it you plan to save. Move it and forget it. Saving is done at the beginning, never at the end. **I'm glad this worked out honey.** |
| PEARL: | Unfortunately not much to save after I pay off all school |

15

> loans/debt - $58k total for every last penny I owe. BUT what a friggen blessing to be debt free at this stage of my life. **So glad it worked out as well – very very very grateful**

> (emphasis added)

43. On or about August 2, 2023, ROSS HAGHIGHAT and PEARL had the following message exchange:

> ROSS HAGHIGHAT: Kirst, I'd like to close the loop on fund transfer this week. Easiest is to write out a check or transfer to me and I'll redirect into individual accounts. Let's discuss logistics tonight. Thnx

> PEARL: No prob – it's sitting in my [Broker-4] account as cash, I'll transfer it to my bank now so it goes in in next 48 hrs

> PEARL: Was gonna do it last week but got sidetracked with the nyc stuff, everything here, sorry

> PEARL: But yes no prob to get a cashiers check over to you when ready

44. On or about August 4, 2023, PEARL caused the transfer of approximately $62,757.84 from the Broker-4 Account to PEARL's Bank-1 account.

45. On or about August 5, 2023, PEARL messaged ROSS HAGHIGHAT, writing: "Also cash is now in bank account can get you a check who should it be made out to . . . Was going to write check for $57,500 – total of $62,500 less $5k for the investment vehicle on my end that we talked about."

16

46.    On or about August 7, 2023, PEARL caused a cashier's check in the amount of approximately $55,015 to be drawn from PEARL's Bank-1 account for the benefit of ROSS HAGHIGHAT, which ROSS HAGHIGHAT later claimed in messages to PEARL that he lost. From in or around August 2023 to in or around October 2023, PEARL and ROSS HAGHIGHAT then discussed how long it would take PEARL to replace the lost check.

47.    On or about August 9, 2023, for instance, PEARL and ROSS HAGHIGHAT had the following message exchange concerning replacing the purportedly lost check:

| | |
|---|---|
| PEARL: | Let's have mom look – I'd have to get an indemnity bond (insurance) for the amount of the check and that could take up to 90 days to replace, and I get a cancellation fee |
| | It HAS to be in there somewhere – did you take it with you to work on Monday or anything |
| ROSS HAGHIGHAT: | I have not seen it |
| | . . . |
| PEARL: | . . . Manager at nbpt [Bank-1] calling me back soon **I lied and said it was for a wedding this weekend and urgent**, if they can even just cancel it so the money goes back and I can write a standard $55k check etc, she's looking into what she can |
| | (emphasis added) |

17

48.     On or about August 24, 2023, PEARL and ROSS HAGHIGHAT had the

following message exchange:

| | |
|---|---|
| ROSS HAGHIGHAT: | The $55k can be claimed 91 days after issue. It was issued on Aug 5 so earliest will be Oct 6th which it socks (sic) |
| PEARL: | Ugh. That just makes no sense to me, it's a check, they have all the info, we know nobody else has it, should be as easy as just cancelling a check. Really dumb. I'm so sorry |

49.     On or about November 6, 2023, PEARL and ROSS HAGHIGHAT had

the following message exchange:

| | |
|---|---|
| PEARL: | Heading to [Bank-1] – do u have wiring instructions? I can also just have it canceled for now and deal with it when you're back |
| ROSS HAGHIGHAT: | Plse ask [Individual-1]. I'm on conf call. Thnx honey |
| PEARL: | I did – all good – we'll take care of it. Talk soon |
| ROSS HAGHIGHAT: | Thanks honey |

50.     On or about November 13, 2023, ROSS HAGHIGHAT deposited into the

Broker-3 Account a $55,000 cashier's check purchased by PEARL on or about

November 6, 2023, and made out to ROSS HAGHIGHAT.

51.     On or about April 24, 2024, PEARL messaged a family member

concerning the purportedly missing check, and said, in part: "I just totally had a brain

popping realization – you know how SOMEHOW a $60k check went missing . . . it

was intentional – since **it was an illegal insider trading move . . . .**" (emphasis added). Later in the message thread, PEARL told the family member, "**Delete these lol**" (emphasis added).

<u>SABZEVARI</u>

52.    ROSS HAGHIGHAT, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to SABZEVARI, who traded Company-1 securities on the basis of that MNPI. SABZEVARI purchased Company-1 shares and call options, including out-of-the-money call options, in advance of the Acquisition Announcement for a profit of approximately $283,826.

53.    On or about May 25, 2023, approximately three days after Company-2 indicated it would increase its proposed all-cash purchase price to $36.00 per share, SABZEVARI and ROSS HAGHIGHAT exchanged approximately twelve text messages.

54.    The next day, on or about May 26, 2023, SABZEVARI called his broker at Broker-1 on a recorded line. On the call, SABZEVARI asked, "if I wanted to move my money from my bank account to my, what do you call it, investment account **today** and have it settle **today**, what are my options?" (emphasis added). Later, he asked whether he could "put like $10,000 cash into an ATM and deposit it into the checking account?" SABZEARI told his broker he was curious "how much money I could shove into the ATM." He also asked, "If I wanted to do options trading . . . do I have to wait until that money gets settled before I can do options trading or can I begin now? Because I literally just sold [a stock]."

55.    Later on or about May 26, 2023, after initiating a wire of funds to Broker-1, SABZEVARI called his broker at Broker-1 on a recorded line to check on the wire. On the call, SABZEVARI stated that it was his "first time making a wire" and he wondered if it might come through before the end of the day so that he could move the funds to his brokerage account. Later, SABZEVARI called his broker at Broker-1 again, explaining that he had driven to a physical bank branch with cash to try to make a cash deposit "straight into the brokerage account." SABZEVARI also began placing orders to buy Company-1 call options. By the end of that trading day, he had purchased approximately 102 Company-1 call options.

56.    On or about May 30, 2023, SABZEVARI purchased approximately 64 additional Company-1 call options.

57.    On or about May 31, 2023, SABZEVARI purchased approximately 90 additional Company-1 call options.

58.    On or about June 5, 2023, SABZEVARI sent approximately two text messages to ROSS HAGHIGHAT.

59.    On or about June 6, 2023, SABZEVARI purchased approximately 60 additional Company-1 call options.

60.    On or about June 9, 2023, ROSS HAGHIGHAT and SABZEVARI exchanged numerous text messages. Also on or about that day, SABZEVARI purchased an additional approximately 620 Company-1 shares.

61.    On or about June 12, 2023, the day of the Acquisition Announcement, SABZEVARI placed a call to Broker-1 on a recorded line at approximately 3:34 a.m.

On the call, he stated, among other things, "I bought options . . . I'm just seeing on Google right now that the company was acquired. . . . need help in understanding the right price to sell the options at because . . . limited experience." SABZEVARI made a number of additional statements on the call, including, "I just don't know anything really about options," and "I messed with options once before. I lost, like, $20k. I don't know why I did it again, but I thought I got lucky."

62.    On or about June 12, 2023, SABZEVARI sold all of his approximately 620 Company-1 shares and all of his approximately 316 Company-1 options for a profit of approximately $283,826. Later that day, SABZEVARI and ROSS HAGHIGHAT exchanged numerous text messages.

<u>ROBERGE</u>

63.    ROSS HAGHIGHAT, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to ROBERGE, who traded Company-1 securities on the basis of that MNPI. ROBERGE traded approximately 10,800 Company-1 shares in advance of the announcement of the acquisition for a profit of approximately $172,738.

64.    In his role as an engineer at Company-4, ROBERGE received training and instruction on insider trading and its prohibition. For example, Company-4 records show that ROBERGE acknowledged reviewing Company-4's Code of Conduct in multiple years. The Company-4 Code of Conduct ROBERGE acknowledged contained a section defining and prohibiting insider trading. For example, the Code

of Conduct made clear that employees should "[n]ever engage in insider trading," and

explained:

> You cannot trade company stock (or the stock of other
> companies) based on material, nonpublic information,
> which is information that is not publicly known and that
> could help investors choose whether to buy or sell
> securities. The laws also prohibit you from giving inside
> information to a friend, family member, or anyone else who
> then makes trades.
>
> . . .
>
> Material information may include . . . merger, acquisition
> or divestiure discussions . . . . Failure to comply can result
> in substantial civil and criminal penalties.

Despite his training, ROBERGE received MNPI about the Company-1 acquisition

from ROSS HAGHIGHAT and traded Company-1 securities on the basis of that

MNPI.

65.    On or about May 7, 2023, the day after ROSS HAGHIGHAT participated

in one of the board meetings to discuss Company-2's proposal, ROSS HAGHIGHAT

and ROBERGE exchanged several text messages, including this exchange:

> ROSS HAGHIGHAT:    Jim, flight a little delayed. I'll
> be closer to 3.30. Hope it's not
> too late.
>
> ROBERGE:    I picked up beer and dip My
> back yard

66.    At approximately 5:20 p.m. the same day, a Sunday on which stock

markets were closed, ROBERGE placed an order to buy approximately 500 shares of

Company-1 stock in his Broker-5 brokerage account (the "Broker-5 Account"). At

approximately 5:26 p.m., ROBERGE transferred approximately $60,000 from his account at Credit Union-1 to the Broker-5 Account. That was the largest single transaction that year in ROBERGE's Credit Union-1 account. Later that same evening, ROBERGE sent several texts to ROSS HAGHIGHAT.

67. On or about May 8, 2023, ROBERGE and ROSS HAGHIGHAT exchanged text messages. The same day, ROBERGE purchased approximately 6,000 Company-1 shares across his accounts at Broker-2 and Broker-5. Also that day, ROBERGE engaged in a chat conversation with a Broker-5 broker in which ROBERGE asked, "do i need to wait for the completion to the settlement account before i can use the funds[?]"

68. On or about May 9, 2023, ROBERGE purchased an additional approximately 1,000 Company-1 shares.

69. On or about May 10, 2023, ROBERGE purchased an additional approximately 1,000 Company-1 shares. Also on or about that day, ROBERGE sent text messages to ROSS HAGHIGHAT.

70. On or about May 12, 2023, ROBERGE purchased an additional approximately 700 Company-1 shares.

71. On or about May 15, 2023, ROBERGE purchased an additional approximately 300 Company-1 shares.

72. On or about May 16, 2023, ROBERGE and ROSS HAGHIGHAT exchanged text messages. This was the same day that Company-1's Board, including ROSS HAGHIGHAT, and senior management met with advisors to discuss a meeting

that was held on or about the previous day, at which Company-1's senior management and a financial advising firm presented information on Company-1's clinical and preclinical programs to Company-2.

73.    From on or about May 22, 2023, to on or about May 24, 2023, ROBERGE and ROSS HAGHIGHAT exchanged numerous text messages. On or about May 24, 2023, ROSS HAGHIGHAT and ROBERGE spoke on the phone for approximately over six minutes.

74.    On or about May 30, 2023, ROBERGE purchased an additional approximately 700 Company-1 shares.

75.    On or about June 5, 2023, ROBERGE purchased approximately 400 additional Company-1 shares.

76.    When ROSS HAGHIGHAT published a LinkedIn post announcing the Acquisition, ROBERGE commented on the post, writing, "Congratulations Ross!"

77.    On or about August 14, 2023, ROBERGE called Broker-5 on a recorded line. On the call, ROBERGE asked the Broker-5 representative how he could sell his Company-1 shares. ROBERGE made several statements regarding the acquisition on the call. For example, ROBERGE stated: "yeah, he uh kinda told me, um, . . . [Company-2] was buying out, um buying out, um, this [Company-1]. I think it was. . . actually, it was at $38 a share, but they had several contingent value conditions associated with it. That increased value of it. . . . So several things that could bump the stock up to as much as $44 a share."

24

78.    The following day, on or about August 15, 2023, ROBERGE called Broker-5 on a recorded line and stated to a representative: "[Company-1], . . . I think it was May . . . or June 15th or something that's when the merger with [Company-2] actually started."

79.    ROBERGE profited approximately $172,738 from his Company-1 shares when the Acquisition occurred.

<u>COUNT 1</u>
**(Securities Fraud)**

80.    Paragraphs 1 through 79 of this Indictment are realleged here.

81.    From in or around May 2023 to at least in or around November 2023, in the District of New Jersey and elsewhere, the defendants,

**ROUZBEH "ROSS" HAGHIGHAT,**
**BEHROUZ "BRUCE" HAGHIGHAT,**
**KIRSTYN M. PEARL,**
**SEYEDFARBOD "FABIO" SABZEVARI,** and
**JAMES D. ROBERGE,**

did knowingly, and with the intent to defraud, execute and attempt to execute a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934; and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, that is, the defendants and co-schemers executed and attempted to execute a scheme to defraud in knowing violation of duties owed by ROSS HAGHIGHAT to Company-1—specifically, ROSS HAGHIGHAT, BRUCE HAGHIGHAT, PEARL, SABZEVARI, and ROBERGE used material nonpublic information ROSS HAGHIGHAT obtained regarding a proposed merger between Company-1 and Company-2 to execute, and cause and assist others to execute, transactions in Company-1 securities.

26

In violation of Title 18, United States Code, Section 1348 and Section 2.

<u>COUNTS 2–17</u>
**(Securities Fraud)**

82.    Paragraphs 1 through 79 of this Indictment are realleged here.

83.    On or about the dates specified as to each count below, in the District of New Jersey, and elsewhere, the defendants,

**ROUZBEH "ROSS" HAGHIGHAT,**
**BEHROUZ "BRUCE" HAGHIGHAT,**
**KIRSTYN M. PEARL,**
**SEYEDFARBOD "FABIO" SABZEVARI, and**
**JAMES D. ROBERGE,**

did knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, that is, in violation of his duties of trust and confidence to Company-1, ROSS HAGHIGHAT knowingly and willfully traded Company-1 securities on the basis of material nonpublic information that he obtained in the course of his service as a Director on Company-1's Board of Directors, and provided

28

that material nonpublic information to BRUCE HAGHIGHAT, PEARL, SABZEVARI, and ROBERGE in anticipation that each of them would trade Company-1 securities on that information, and BRUCE HAGHIGHT, PEARL, SABZEVARI, and ROBERGE, knowing that the information had been obtained in breach of a duty, willfully used it to execute and cause others to execute the securities transactions listed below on or about the dates listed below, each such transaction constituting a separate count of this Indictment:

| Count | Defendant(s) | Approx. Date | Approx. Number of Company-1 Securities Purchased | Approx. Price per Share or Contract |
|---|---|---|---|---|
| 2 | ROSS HAGHIGHAT | June 8, 2023 | 40 shares | $23.69 |
| 3 | ROSS HAGHIGHAT BRUCE HAGHIGHAT | May 26, 2023 | 2,000 shares | $22.66 |
| 4 | ROSS HAGHIGHAT PEARL | June 5, 2023 | 153 call options | $0.37 |
| 5 | ROSS HAGHIGHAT SABZEVARI | May 26, 2023 | 102 call options | $0.85 |
| 6 | ROSS HAGHIGHAT SABZEVARI | May 30, 2023 | 60 call options | $0.75 |
| 7 | ROSS HAGHIGHAT SABZEVARI | May 30, 2023 | 4 call options | $2.40 |
| 8 | ROSS HAGHIGHAT SABZEVARI | May 31, 2023 | 90 call options | $2.20 |
| 9 | ROSS HAGHIGHAT SABZEVARI | June 6, 2023 | 60 call options | $2.00 |
| 10 | ROSS HAGHIGHAT SABZEVARI | June 9, 2023 | 620 shares | $24.60 |
| 11 | ROSS HAGHIGHAT ROBERGE | May 8, 2023 | 6,000 shares | $20.83 |
| 12 | ROSS HAGHIGHAT ROBERGE | May 9, 2023 | 1,000 shares | $21.40 |

| 13 | ROSS HAGHIGHAT ROBERGE | May 10, 2023 | 1,000 shares | $22.37 |
| 14 | ROSS HAGHIGHAT ROBERGE | May 12, 2023 | 700 shares | $23.12 |
| 15 | ROSS HAGHIGHAT ROBERGE | May 15, 2023 | 300 shares | $23.87 |
| 16 | ROSS HAGHIGHAT ROBERGE | May 30, 2023 | 700 shares | $23.94 |
| 17 | ROSS HAGHIGHAT ROBERGE | June 5, 2023 | 400 shares | $25.32 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNT 18
**(Securities Fraud Conspiracy)**

84.    Paragraphs 1 through 79 of this Indictment are realleged here.

85.    From in or around May 2023 through in or around July 2023, in the District of New Jersey and elsewhere, the defendants,

**ROUZBEH "ROSS" HAGHIGHAT** and
**BEHROUZ "BRUCE" HAGHIGHAT,**

did knowingly and intentionally conspire and agree with each other to commit securities fraud, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

31

## COUNT 19
### (Securities Fraud Conspiracy)

86.     Paragraphs 1 through 79 of this Indictment are realleged here.

87.     From in or around May 2023 through in or around November 2023, in the District of New Jersey and elsewhere, the defendants,

**ROUZBEH "ROSS" HAGHIGHAT** and
**KIRSTYN M. PEARL,**

did knowingly and intentionally conspire and agree with each other to commit securities fraud, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

88.    Upon conviction of any of the counts charged in this Indictment, the defendants, ROUZBEH "ROSS" HAGHIGHAT, BEHROUZ "BRUCE" HAGHIGHAT, KIRSTYN M. PEARL, SEYEDFARBOD "FABIO" SABZEVARI, and JAMES D. ROBERGE, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses.

89.    The property subject to forfeiture includes, but is not limited to, the following:

a.    Approximately $556.80, formerly on deposit in Broker-1 account no. ending -1986, a custodial account for which ROSS HAGHIGHAT served as custodian;

b.    Approximately $32,680, formerly on deposit in Broker-3 account no. ending -0359 in the name of R. Ross Haghighat Irrev. Trust, for which BRUCE HAGHIGHAT served as trustee;

c.    Approximately $114,012, formerly on deposit in Broker-4, account no. ending -4925 in the name of PEARL;

d.    Approximately $283,826, formerly on deposit in Broker-1 account nos. ending -4958 and -2869 in the name of SABZEVARI;

e.    Approximately $112,122, formerly on deposit in Broker-5 account no. ending -5285 in the name of ROBERGE.

f.    Approximately $60,615, formerly on deposit in Broker-2 account nos. ending -4710 and -6133 in the name of ROBERGE.

### Substitute Assets Provision

90.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

33

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third person;

       c.  has been placed beyond the jurisdiction of the Court;

       d.  has been substantially diminished in value; or

       e.  has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL

███████████████

FOREPERSON

ALINA HABBA
United States Attorney

LORINDA I. LARYEA
Acting Chief, Fraud Section
United States Department of Justice

34

CASE NUMBER: 25-339

## United States District Court
## District of New Jersey

## UNITED STATES OF AMERICA

v.

## ROUZBEH "ROSS" HAGHIGHAT, et al.

## INDICTMENT FOR
18 U.S.C. § 1348

15 U.S.C. §§ 78j(b) & 78ff
17 C.F.R. § 240.10b-5
18 U.S.C. § 1349
18 U.S.C. § 2

A True Bill.

██████████████████

ALINA HABBA
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

JOHN MEZZANOTTE
ASSISTANT U.S. ATTORNEY
JOHN J. LIOLOS
DEPARTMENT OF JUSTICE TRIAL ATTORNEY
NEWARK, NEW JERSEY
(973) 645-2700